1

2

3

4

5

6

7

8

9

RONALD S. CONNELLY, DC Bar No. 488298
POWERS PYLES SUTTER & VERVILLE, PC
Admitted pro hac vice
1501 M Street, NW, 7th Floor
Washington, DC 20005
Telephone: (202) 466-6550
ron.connelly@ppsv.com

DICK A. SEMERDJIAN
SCHWARTZ SEMERDJIAN HAILE BALLARD &
CAULEY LLP
California Bar No. 123630
101 West Broadway, Suite 810
San Diego, CA 92101-8229
tel. (619) 699-8326
das@sshbclaw.com
Attorneys for Plaintiff, Palomar Medical Center

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PALOMAR MEDICAL CENTER,<br><br>                    Plaintiff,<br><br>          v.<br><br>KATHLEEN SEBELIUS, Secretary of the<br>United States Department of Health and<br>Human Services,<br><br>                    Defendant. | Case No.  09 cv 0605 - BEN (NLS)<br><br>Hon. Roger T. Benitez<br>Courtroom 3<br><br>OBJECTIONS TO REPORT AND<br>RECOMMENDATION |

{250002.DOC / 4 }

# TABLE OF CONTENTS

I.   Introduction and Statement of the Case ................................................................ 1

II.  Legal Background ................................................................................................ 2

    A.   The Medicare Program and Claim Appeals ................................................ 2

    B.   Reopening of Medicare Claims .................................................................. 3

        1. The Early Regulations ............................................................................ 3

        2. Development of the Current Regulations ............................................... 5

    C.   Recovery Audit Contractors ....................................................................... 6

III. Factual Background ............................................................................................. 7

IV.  Argument ............................................................................................................ 8

    A.   The Report and Recommendation Misapplies the *Thomas Jefferson* Standard to the Reopening and Appeal Regulations ......................................................... 9

        1. Standard of Review ................................................................................ 9

        2. Defendant's Decision Is Not Entitled to Deference Because It Is Inconsistent With Her Prior Statements That She Was Continuing Existing Policies ..................................... 10

        3. The Regulations Only Shield the Discretionary Decision to Reopen .......................... 14

        4. The Report Fails to Consider That the Secretary Has Issued Inconsistent Decisions, Which Undermines Any Deference That She May Be Owed ............................ 17

    B.   The Report Fails to Analyze the Statute, Which Requires that Reopenings Be Subject to Review ............................................................................................... 18

        1. Standard of Review ............................................................................... 18

        2. The Medicare Statute Requires That ALJs Have Jurisdiction to Review the Legality of Contractor Reopenings ........................................................................... 19

            a.   *Chevron* Step 1: The Plain Language of the Statute Requires the Secretary to Reopen Only in Compliance With the Regulations ............................. 19

            b.   *Chevron* Step 2: The Secretary's Interpretation Frustrates Congressional Policy 23

    C.   The Secretary Deprived Palomar of Due Process of Law ............................ 24

    D.   The Report Fails to Determine Whether the RAC Complied With the Reopening Regulations ................................................................................................ 24

        1. This Court Has Jurisdiction to Determine Whether the RAC Complied With the Law, Even if Administrative Review Is Foreclosed ............................................ 24

        2. The RAC Unlawfully Reopened Palomar's Claim for Mr. Doe's Care ....................... 26

V.   Conclusion ......................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anaheim Memorial Hospital v. Shalala*, 130 F.3d 845 (9th Cir. 1997 ......................................... 15

*Barhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ........................................................................ 21

*Barone v. Bowen*, 869 F.2d 49 (2d Cir. 1989) .............................................................................. 22

*Butterworth v. Bowen*, 796 F.2d 1379 (11th Cir. 1986). .............................................................. 25

*Califano v. Sanders*, 430 U.S. 99 (1977) ............................................................... 1, 12, 13, 25

*Cheshire Hospital v. New Hampshire-Vermont Hospitalization Serv., Inc.*, 689 F.2d 1112 (1st
 Cir. 1982) ................................................................................................................................ 10

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ...................... 18-19

*Christensen v. Harris County*, 529 U.S. 576 (2000)....................................................................... 9

*CHW West Bay v. Thompson*, 246 F.3d 1218 (9th Cir. 2001) ...................................................... 19

*Cole v. Barnhart*, 288 F.3d 149 (5th Cir. 2002).................................................... 11, 12, 13, 22, 25

*EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959 (D.C. Cir. 1999)..................................................... 25

*Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326, 2336 (2008) ..................... 21

*Fox v. Bowen*, 835 F.2d 1159 (6th Cir. 1987)................................................................................ 25

*Gardebring v. Jenkins*, 485 U.S. 415 (1988) ................................................................................... 9

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993)............................................................... 18

*Heins v. Shalala*, 22 F.3d 157 (7th Cir. 1994) ............................................................................... 12

*Higginbotham v. Heckler*, 767 F.2d 408 (8th Cir. 1985) .............................................................. 25

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ............................................................................. 18

*Marsh v. Heckler*, CIV No. S-82-1122 LKK, 1984 WL 34769 (E.D. Cal. Feb. 14, 1984) .......... 25

*Maximum Comfort Inc. v. Sec'y of Health and Human Servs.*, 512 F.3d 1081 (9th Cir. 2007) ...... 9

*Miller v. FCC,* 66 F.3d 1140 (11th Cir. 1995)............................................................................... 25

*Munsinger v. Schweiker*, 709 F.2d 1212 (8th Cir. 1983) .............................................................. 25

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518 (2007).......................... 21

*Nat'l R. R. Passenger Corp. v. Nat' Ass'n of R. R. Passengers*, 414 U.S. 453 (1974).................. 22

*Nat'l Res. Def. Council v. E.P.A.*, 526 F.3d 591 (9th Cir. 2008) .................................................. 17

*Nieland v. Shalala*, 1994 WL 163255 (D.Or. 1994) ..................................................................... 22

*Overend v. Sullivan*, 879 F.2d 673 (9th Cir. 1989)....................................................................... 25

*Porter v. Nussle*, 534 U.S. 516 (2002) .......................................................................................... 21

*Service v. Dulles*, 354 U.S. 363 (1957)................................................................................... 20, 26

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...................................................................... 10-18

*Steel Company v. Citizens for a Better Environment*, 523 U.S. 83 (1998) .................................... 18

*Taylor v. Heckler*, 765 F.2d 872 (9th Cir. 1985). ......................................................................... 22

*Tex. Med. Ass'n v. Sullivan*, 875 F.2d 1160 (5th Cir. 1989)................................................... 13, 23

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994).............................................. 9, 10, 14, 15

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) .................................................................................... 22

*United States v. Beck*, 758 F.2d 1553 (11th Cir. 1985)................................................................. 13

*United States v. Larinoff*, 431 U.S. 864 (1977)............................................................................. 10

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................................................... 18

*United States v. Mitchell,* 18 F.3d 1355 (7th Cir.1994) ............................................................... 25

*Warren v. U.S. Dep't of the Interior Bureau of Land Mgmt.*, 724 F.2d 776 (9th Cir. 1984)......... 25

*Watt v. Alaska*, 451 U.S. 259 (1981)............................................................................................. 25

*Wyatt v. Barnhart*, 349 F.3d 983 (7th  Cir. 2003)................................................................... 22, 25

*Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449 (1999) .................. 1, 12, 19, 20

*Zimmermann v. Heckler*, 774 F.2d 615 (4th Cir. 1985)................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Statutes**

5 U.S.C. § 551 *et seq* ...................................................................................................... 9

5 U.S.C. § 706 ................................................................................................................... 9

42 U.S.C. § 405(b) ..................................................................................................... 3, 22

42 U.S.C. § 405(g) ..................................................................................................... 3, 9

42 U.S.C. § 405(h) ............................................................................................................ 3

42 U.S.C. §§ 1395-1395ccc .............................................................................................. 3

42 U.S.C. §§ 1395-1395iii ................................................................................................ 2

42 U.S.C. § 1395c .............................................................................................................. 2

42 U.S.C. § 1395i-5(c)(2)(D) .......................................................................................... 23

42 U.S.C. § 1395*l*(i)(2)(D)(v) ........................................................................................ 23

42 U.S.C. § 1395*l*(m)(4) ................................................................................................ 23

42 U.S.C. § 1395*l*(t)(12) ............................................................................................... 23

42 U.S.C. § 1395m(*l*)(5) ................................................................................................ 23

42 U.S.C. § 1395m(*l*)(12)(B)(v) ................................................................................... 23

42 U.S.C. § 1395u(o)(7) .................................................................................................. 23

42 U.S.C. § 1395w-3(a)(1)(D)(i)(IV) ............................................................................. 23

42 U.S.C. § 1395w-3(b)(11) ........................................................................................... 23

42 U.S.C. § 1395w-3a(g) ................................................................................................ 23

42 U.S.C. § 1395w-3b(g) ................................................................................................ 23

42 U.S.C. § 1395w-4(i)(1) .............................................................................................. 23

42 U.S.C. § 1395w-4(k)(7) ............................................................................................. 23

42 U.S.C. § 1395w-4(m)(5)(E) ....................................................................................... 23

42 U.S.C. § 1395w-4(o)(3)(C) ........................................................................................ 23

42 U.S.C. § 1395w-23(*l*)(8) .......................................................................................... 23

42 U.S.C. § 1395w-23(m)(6) .......................................................................................... 23

42 U.S.C. § 1395x(v)(1)(A) ............................................................................................ 13

42 U.S.C. § 1395ff(a) ........................................................................................................ 2

42 U.S.C. § 1395ff(b) ...................................................................................................... 22

42 U.S.C. § 1395ff(b)(1) ................................................................................................... 2

42 U.S.C. § 1395ff(b)(1)(A) ............................................................................................. 3

42 U.S.C. § 1395ff(b)(1)(G) ....................................................................... 5, 17, 19, 20, 21, 26

42 U.S.C. § 1395ff(c) ........................................................................................................ 2

42 U.S.C. § 1395ff(f) ...................................................................................................... 21

42 U.S.C. § 1395ff(h)(6) ................................................................................................. 21

42 U.S.C. § 1395oo(a) .................................................................................................... 13

42 U.S.C. § 1395oo(g) .................................................................................................... 23

42 U.S.C. § 1395rr(b)(12)(H) ......................................................................................... 23

42 U.S.C. § 1395rr(b)(14)(G) ......................................................................................... 23

42 U.S.C. § 1395rr(h)(5) ................................................................................................. 23

42 U.S.C. § 1395ww(a) ................................................................................................... 13

42 U.S.C. § 1395ww(d)(7) .............................................................................................. 23

42 U.S.C. § 1395ww(h) ................................................................................................... 13

42 U.S.C. § 1395ww(h)(7)(E) ......................................................................................... 23

42 U.S.C. § 1395ww(j)(7) ............................................................................................... 24

42 U.S.C. § 1395ww(n)(4)(A) ........................................................................................ 24

42 U.S.C. § 1395yy(e)(8) ................................................................................................ 24

42 U.S.C. § 1395ddd(f)(3) .............................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

42 U.S.C. § 1395ddd(h) ................................................................................................ 6-7
42 U.S.C. § 1395fff(d) ..................................................................................................... 24
42 U.S.C. § 1395hhh(i) .................................................................................................... 24
Department of Education Organization Act, Pub. L. No. 96-88, § 509, 93 Stat. 668 (1979) .......... 3
Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA")
    Pub. L. No. 106–554, § 521, 114 Stat. 2763, 2763A-534 (2000) ................................... 5
Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L.
    No. 108-173, § 306, 117 Stat. 2066, 2256 ..................................................................... 6
Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ............. 24
Social Security Independence and Program Improvement Act of 1994, Pub. L. No. 103-296, §
    101, 108 Stat. 1464 (1994) ............................................................................................ 4
U.S. Const. art. III, § 2 .................................................................................................. 25


**Regulations**
20 C.F.R. § 404.957 (1960) ............................................................................................ 4
20 C.F.R. § 404.958 (1960) ............................................................................................ 4
42 C.F.R. § 405.750(b) (2004) .................................................................................... 5, 11
42 C.F.R. § 405.920 ....................................................................................................... 2
42 C.F.R. § 405.926(*l*) (2005) .................................................................... 6, 13, 14, 16
42 C.F.R. § 405.940 ....................................................................................................... 2
42 C.F.R. § 405.968 ....................................................................................................... 2
42 C.F.R. § 405.968(a) .............................................................................................. 15, 16
42 C.F.R. § 405.980(a)(5) (2005) ................................................................ 6, 13, 14, 16, 17
42 C.F.R. § 405.980(b) (2005) ............................................................................ 6, 13, 20
42 C.F.R. § 405.986(a) (2005) ................................................................................... 6, 20
42 C.F.R. § 405.1002 ..................................................................................................... 2
42 C.F.R. § 405.1032 ............................................................................................... 14, 16
42 C.F.R. § 405.1032(b) ....................................................................................... 3, 14, 16
42 C.F.R. § 405.1100 ..................................................................................................... 3
42 C.F.R. § 405.1835 ................................................................................................... 13
42 C.F.R. § 405.1885(a)(6) .......................................................................................... 14


**Federal Registers**
25 Fed. Reg. 1,677 (Feb. 26, 1960) ............................................................................... 4
31 Fed. Reg. 16,765 (Dec. 31, 1966) ............................................................................. 4
37 Fed. Reg. 5,814 (Mar. 22, 1972) ............................................................................... 4
42 Fed. Reg. 13,262 (Mar. 9, 1977) ............................................................................... 3
42 Fed. Reg. 58,826 (Sept. 30, 1977) ............................................................................ 4
66 Fed. Reg. 35,437 (July 5, 2001) ................................................................................ 3
70 Fed. Reg. 11,420 (Mar. 8, 2005) .............................................................. 5, 10, 11, 21
74 Fed. Reg. 65,296 (Dec. 9, 2009) ........................................................................ 4, 6, 14

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Administrative Decisions**

*Harbor Healthcare & Rehab. Ctr. (Lewes, Del.) v. BlueCross BlueShield Ass'n/Empire Medicare Servs. (n/k/a Nat'l Gov't Servs.-NY)*, Dec. No. 2007-D64, Medicare & Medicaid Guide (CCH) ¶ 81,775 (Aug. 24, 2007) ........................................................................................................ 13

*In the Case of Palomar Medical Center*, (MAC Jan. 11, 2008) ("*Palomar I*") ....................... 17-18

*Logos Healthcare Rehab. of Tenn., Inc. (Franklin, Tenn.) v. BlueCross BlueShield Ass'n/Palmetto Gov't Benefits Adm'rs*, Dec. No. 2007-D77, Medicare & Medicaid Guide (CCH) ¶ 81,788 (Sep. 27, 2007) ................................................................................................................ 13

*Mark Twain St. Joseph's Hosp. (San Andreas, Cal.) v. BlueCross BlueShield Ass'n/United Gov't Servs.*, Dec. No. 2002-D30, Medicare & Medicaid Guide (CCH) ¶ 80,889 (Aug. 2, 2002) ..... 14

*Med. Ctr. of N. Hollywood (North Hollywood, Cal.) v. BlueCross BlueShield Ass'n/ Nat'l Gov't Servs.-CA*, Dec. No. 2008-D31, Medicare & Medicaid Guide (CCH) ¶ 82,103 (Jun. 18, 2008) .................................................................................................................... 13, 14, 15


**Other Authorities**

American Heritage Dictionary of the English Language 1958 (4th ed., Houghton Mifflin Co. 2006) ................................................................................................................................... 16

U.S. Dep't of Health and Human Servs., *Social Security Handbook, 1988*, § 2186, *available at* http://mirlyn.lib.umich.edu/Record/003924628/Holdings#1 ............................................... 11, 12

U.S. Dep't of Health and Human Servs., *Social Security Handbook, 2010*, § 2197, *available at* http://www.socialsecurity.gov/OP_Home/handbook/handbook.21/handbook-2197.html ........... 22

1   **I.      INTRODUCTION AND STATEMENT OF THE CASE**

2           Regulations must have meaning.  A regulation that is flaunted at will, free from review,

3   becomes a nullity.  The Secretary of Health and Human Services asks this Court to turn its head

4   while her agency renders null a regulation that has existed, essentially unchanged, for more than

5   40 years.  The Magistrate has issued a Report and Recommendation ("Report") that wholly ac-

6   cepts the Secretary's policies.  Palomar Medical Center objects to the Report and respectfully re-

7   quests that this Court reject the Secretary's actions as contrary to the regulations and the enabling

8   statute.[1]

9           The Medicare statute permits the Secretary to reopen claims if she does so in compliance

10  with her regulations.  In response to this statutory mandate, the Secretary in 2005 issued regula-

11  tions establishing strict timeframes and standards for reopening Medicare claims.  The regulations

12  require "good cause" to reopen claims that are more than one year old.  Those regulations largely

13  parroted regulations that had governed the reopening of Medicare claims since the program was

14  enacted in 1965. At the same time, the Secretary issued regulations that she now claims divest

15  administrative tribunals of jurisdiction to review whether her auditors reopen claims in com-

16  pliance with the regulations.  These latter regulations, however, were lifted virtually verbatim

17  from Social Security policies that did not have the effect that she claims.  Because the Secretary

18  in 2005 claimed to be carrying forward existing policies by adopting these regulations, her current

19  interpretation, which is contrary to longstanding practice, is not entitled to deference and should

20  be rejected.

21          The regulations do not divest administrative tribunals of jurisdiction to enforce the reo-

22  pening regulations.  Rather, the regulations foreclose from review only the discretionary decision

23  to reopen a claim lawfully or to reject a request to reopen. The regulations simply codify Supreme

24  Court precedents holding that a discretionary reopening is free from review.  *Califano v. Sanders*,

25  430 U.S. 99 (1977); *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449 (1999).

26  ───────────────

27  [1] Palomar refers the Court to its Memorandum of Points and Authorities in Support of Plaintiff's
    Motion for Summary Judgment ("Pl.'s S.J. Mot.") and Plaintiff's Memorandum of Law in Oppo-
    sition to Defendant's Motion for  Summary Judgment and Plaintiff's Reply in Support of Its Mo-
28  tion for Summary Judgment ("Pl.'s Opp'n.") for a complete discussion of its position.

The Report also errs by not evaluating whether good cause was established here.  Federal agencies cannot deprive federal courts of jurisdiction.  Therefore, if the Secretary is correct that she may remove good cause from administrative review, the federal courts must ensure that she obeys the law.

## II.     LEGAL BACKGROUND

### A.     <u>The Medicare Program and Claim Appeals</u>

The Medicare program, established at Title XVIII of the Social Security Act (the "Medicare statute"), is a public health insurance program that furnishes health benefits to individuals who are at least 65 years old, have a qualifying disability, or suffer from end-stage renal disease.  42 U.S.C. § 1395c; *see generally Id.* §§ 1395–1395iii.  The Secretary of Health and Human Services has delegated much of the responsibility for administering the Medicare program to the Centers for Medicare & Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration (hereinafter collectively referred to as "CMS").  The Secretary contracts with fiscal intermediaries, which are typically private insurance companies, to perform many of her audit and payment functions under Medicare.

A fiscal intermediary's decision either to pay or deny payment for a claim is known as an "initial determination."  42 U.S.C. § 1395ff(a); 42 C.F.R. § 405.920.  A Medicare provider may appeal an adverse initial determination to its Medicare fiscal intermediary.  42 C.F.R. § 405.940.  The intermediary's decision either to uphold or reverse the initial determination or a revised initial determination is known as a "redetermination."  42 C.F.R. § 405.940.  A Medicare provider may appeal an adverse redetermination to a Qualified Independent Contractor ("QIC").  42 U.S.C. § 1395ff(b)(1), (c).  QICs are contractors of CMS.  The QIC's decision is known as a "reconsideration."  *Id.* § 1395ff(c).  The intermediary and QIC make their decisions based upon a review of the records and any submissions by the provider without an evidentiary hearing.  42 C.F.R. §§ 405.947,  405.968.

A Medicare provider may appeal an adverse reconsideration to an administrative law judge ("ALJ"), which holds an evidentiary hearing where the provider may present testimony to support its claim.  42 U.S.C. § 1395ff(b)(1); 42 C.F.R. § 405.1002.  Medicare ALJs are within the

1    Office of Medicare Hearings and Appeals, which is part of the Department of Health and Human

2    Services but is not a component of CMS.  The ALJ considers "all the issues brought out in the

3    initial determination, redetermination, or reconsideration."  42 C.F.R. § 405.1032(a).  The ALJ

4    may consider a "new issue" if the issue "(i) Could have a material impact on the claim or claims

5    that are the subject of the request for hearing; and (ii) Is permissible under the rules governing

6    reopening of determinations and decisions (see § 405.980)."  *Id.* at § 405.1032(b).  An adverse

7    ALJ decision may be appealed to the Medicare Appeals Council ("MAC").  42 C.F.R. §

8    405.1100.  The MAC's decision constitutes the Secretary's final administrative decision, which

9    may be appealed to federal court.  42 U.S.C. §§ 405(g), (h), 1395ff(b)(1)(A).

10    **B.**      **Reopening of Medicare Claims**

11          *1.      The Early Regulations*

12          Medicare regulations governing claim appeals and reopening of claims for services have a

13    long history that bears directly upon this dispute.  The statutory provisions creating Medicare are

14    found at Title XVIII of the Social Security Act.  *See generally* 42 U.S.C. §§ 1395-1395ccc.  Med-

15    icare is literally a component of Social Security.  The statutory right to administrative appeal for

16    both is established at 42 U.S.C. § 405(b), and judicial review is governed by 42 U.S.C. § 405(g).

17    *See* 42 U.S.C. § 1395ff(b)(1)(A).  Section 405(g) entitles a party to judicial review after a "final

18    decision of the [Secretary] made after a hearing."

19          The two programs have historically shared some regulations and been administered to-

20    gether.  Until 1977, Medicare was overseen by the Social Security Administration's ("SSA's")

21    Bureau of Health Insurance.  *See* 42 Fed. Reg. 13,262, 13,262 (Mar. 9, 1977).  In that year, the

22    Health Care Financing Administration ("HCFA") was established, which was CMS's prior name.

23    42 Fed. Reg. at 13,262; 66 Fed. Reg. 35,437, 35,437 (July 5, 2001).  From 1977 until 1994, Med-

24    icare and other Social Security programs continued to be administered by a single federal agency,

25    first, the Department of Health, Education, and Welfare ("HEW"), and then the Department of

26    Health and Human Services ("HHS").  *See* Department of Education Organization Act, Pub. L.

27    No. 96-88, § 509, 93 Stat. 668 (1979).  In 1994, SSA became a stand-alone agency, while the

28    Medicare program remained with HHS.  Social Security Independence and Program Improve-

1   ment Act of 1994, Pub. L. No. 103-296, § 101, 108 Stat. 1464 (1994).

2          Until 2005, SSA regulations largely governed the reopening of Medicare claims and ap-

3   peals of Medicare claim determinations.  74 Fed. Reg. 65,296, 65,297 (Dec. 9, 2009).  The regu-

4   lations applicable to reopening claims have remained remarkably similar over the decades.  In

5   1960, prior to enactment of Medicare, SSA regulations stated that initial determinations of en-

6   titlement to or payment for Social Security benefits could be reopened as follows:

> An initial or reconsidered determination of the Bureau [of Old-Age and Survivors
> Insurance] or a decision of a hearing examiner or of the Appeals Council . . . may
> be reopened:
>
> (a) Within 12 months from the date of the notice of initial determination (see §
>     404.907), to the party to such determination, or
>
> (b) After such 12-month period, but within 4 years after the date of the notice of
>     the initial determination (see § 404.907) to the party to such determination,
>     upon a finding of good cause for reopening such determination or deci-
>     sion . . . .

13   20 C.F.R. § 404.957 (1960); 25 Fed. Reg. 1,677, 1,683 (Feb. 26, 1960).  "Good cause" was de-

14   fined as follows:

> "Good cause" shall be deemed to exist where:
>
> (a) New and material evidence is furnished after notice to the party to the initial
>     determination;
> (b) A clerical error has been made in the computation of benefits;
> (c) There is an error as to such determination or decision on the face of the evi-
>     dence which such determination or decision is based.

19   20 C.F.R. § 404.958 (1960); 25 Fed. Reg. at 1,683.  These regulations were made applicable to

20   Medicare claims shortly after Medicare was enacted.  *See* 31 Fed. Reg. 16,765 (Dec. 31, 1966).

21          In 1972, SSA issued appeal regulations specifically for Medicare claims, which incorpo-

22   rated by reference many of the SSA appeal regulations at 20 C.F.R. § 404.901 et seq.  37 Fed.

23   Reg. 5,814 (Mar. 22, 1972).  The 1972 Medicare reopening regulation was virtually identical to

24   the 1960 SSA regulation and continued to refer to the SSA definition of good cause.  *Id.* at 5,816

25   (establishing 20 C.F.R. § 405.750).  In 1977, the regulations governing Medicare reopenings and

26   appeals were moved to title 42 of the C.F.R. but continued to incorporate the SSA good cause

27   standard at 20 C.F.R. § 404.958.  42 Fed. Reg. 58,826 (Sept. 30, 1977).

28

### 2.     Development of the Current Claim Regulations

In 2000, Congress enacted changes to the Medicare claims appeals process.  Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106–554, § 521, 114 Stat. 2763, 2763A-534 (2000).  One change was to furnish the Secretary with a statutory basis for reopening claims:  "The Secretary may reopen or revise any initial determination or reconsidered determination . . . under guidelines established by the Secretary in regulations."  *Id.* § 521, 114 Stat. at 2763A-537; 42 U.S.C. § 1395ff(b)(1)(G).   This authorization was contained in a section of the statute entitled "Appeal Rights."  42 U.S.C. § 1395ff(b).

In 2004, the Medicare reopening regulation was virtually unchanged from the 1972 Medicare regulation and the 1960 SSA regulation.  42 C.F.R. § 405.750(b) (2004).  The regulation still incorporated the SSA good cause standard at 20 C.F.R. § 404.989, which was very similar to the 1960 standard.  *Id.* § 405.750(b)(2).

In 2005, CMS promulgated regulations implementing the changes to the appeals process in BIPA and the MMA (the "2005 regulations").  70 Fed. Reg. 11,420 (Mar. 8, 2005).  These are the regulations applicable to this dispute.  The 2005 regulations were issued as an "interim final rule with comment period" because the regulations implementing the MMA provisions had not previously been released in proposed form for public comment.  The 2005 reopening regulations were intended to "address longstanding confusion over the reopening rules for Medicare claim determinations."  *Id.* at 11,450.  CMS explained that the new reopening regulations were designed to "consolidate and clarify the existing reopening provisions."  *Id.*  CMS did not intend the regulations to impose any new requirements or limitations and stated the principle of *Califano v. Sanders*, 430 U.S. 99 (1977) and *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449 (1999) that "[r]eopenings continue to be discretionary actions on the part of the contractors; therefore, *their decision not to reopen is not subject to appeal*."  *Id.* at 11,451 (emphasis added).

Consistent with the long history of the reopening provisions, the 2005 regulations repeated the basic language for reopening timeframes that had been in place for more than four decades:

> Time frames and requirements for reopening initial determinations and redeterminations initiated by a contractor. A contractor may reopen and revise its initial determination or redetermination on its own motion—

> (1) Within 1 year from the date of the initial determination or redetermination for any reason.
>
> (2) Within 4 years from the date of the initial determination or redetermination for good cause as defined in § 405.986. . . .

42 C.F.R. § 405.980(b) (2005).  The regulation at 42 C.F.R. § 405.986(a) defines good cause similarly to prior versions:

> (1) There is new and material evidence that—
> (i) Was not available or known at the time of the determination or decision; and
> (ii) May result in a different conclusion; or
> (2) The evidence that was considered in making the determination or decision clearly shows on its face that an obvious error was made at the time of the determination or decision.

42 C.F.R. § 405.986(a) (2005).  The 2005 regulations also stated, for the first time, that "[t]he contractor's, QIC's, ALJ's, or MAC's decision on whether to reopen is final and not subject to appeal" in the administrative appeals process.  42 C.F.R. § 405.980(a)(5).  The regulations provided that "[a] contractor's, QIC's, ALJ's, or MAC's determination or decision to reopen or not to reopen an initial determination, redetermination, reconsideration, hearing decision, or review decision" is not an initial determination that can be appealed.  42 C.F.R. § 405.926(*l*) (2005).  The 2005 regulations were finalized last December.  74 Fed. Reg. 65,296 (Dec. 9, 2009).

## C.  Recovery Audit Contractors

Congress initially established Recovery Audit Contractors ("RACs") as a three-year demonstration program in at least two states.[2]  Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, § 306, 117 Stat. 2066, 2256.   RACs are private companies that enter into contracts with the Secretary to reopen and audit Medicare claims that have already been paid.  RAC overpayment determinations constitute "initial determinations" that are appealable through the administrative appeals process, i.e., a RAC determination may be appealed to a fiscal intermediary for redetermination, and, if necessary, to a QIC, an ALJ, the MAC, and federal court.  (*See* Administrative Record ("AR") at 274.)  A RAC is paid a percentage of every alleged overpayment that it collects.  MMA § 306(a)(1); 42 U.S.C. §

_____

[2] Congress subsequently made the RAC program permanent and extended it to all 50 states.  Tax Relief and Health Care Act of 2006 § 302, 42 U.S.C. § 1395ddd(h).  This action concerns an audit under the RAC demonstration project.

1   1395ddd(h)(1)(B)(i).

2   **III.     FACTUAL BACKGROUND**

3      Palomar Medical Center ("Palomar") has served the medical needs of the residents of Es-

4   condido, California and surrounding areas since 1950.  Palomar operates an acute rehabilitation

5   unit, referred to by the Medicare program as an inpatient rehabilitation facility ("IRF").  On June

6   20, 2005, at age 79, John Doe underwent a surgical procedure in which his right hip was removed

7   and replaced with a prosthetic device.[3]  (AR at 203, 333.)  Prior to the surgery, he lived alone and

8   could independently care for himself.  (*Id.*)  After the surgery, he could not walk, dress, bathe, use

9   the toilet, prepare food, or get in or out of bed without hands-on assistance from a caregiver.  (AR

10  at 324.)  He also suffered from heart disease and other cardiac conditions, was anemic, and was at

11  high risk for developing blood clots in the veins of one or both of his legs.  (AR at 180, 203-04,

12  335.)  If such a blood clot were to occur, it could dislodge, travel to his lungs, and cause death.

13  (AR at 110-11.)

14     Palomar admitted Mr. Doe to its inpatient rehabilitation unit on June 22, 2005 for multi-

15  disciplinary rehabilitation care under physician supervision.  (AR at 65, 179-81, 198, 203.)  On

16  June 29, 2005, after seven days of care in Palomar's facility, Mr. Doe had learned to use his new

17  hip and care for himself, and his other medical problems were sufficiently controlled so that he

18  was discharged to his home to continue living independently.  (AR at 371.)

19     Palomar submitted to Medicare a claim for payment for the medical care provided to Mr.

20  Doe.  On July 27, 2005, Medicare paid Palomar $7,992.92 for Mr. Doe's inpatient rehabilitation

21  stay.  (AR at 253, 284.)  By letter dated April 27, 2007, the RAC reopened Palomar's claim for

22  Mr. Doe's care and requested that Palomar provide the RAC with medical records supporting the

23  claim.  (AR at 277.)  The RAC did not assert that it had good cause for reopening the claim or

24  even that it had any evidence at all indicating an improper payment.  (*Id.*)  On July 10, 2007, the

25  RAC retroactively denied coverage for the care that Palomar provided to John Doe during the pe-

26  _____

27  [3] John Doe is an alias for the patient whose care is at issue in this action.  This patient is not a par-
ty to this action, and Palomar has de-identified him in compliance with Title II of the Health In-
surance Portability and Accountability Act of 1996 ("HIPAA").  Pub. L. No. 104-191, 110 Stat.
28  1936, 1991.

1   riod from June 22, 2005 to June 29, 2005.  (AR at 273.)  On September 6, 2007, the Secretary re-

2   couped from Palomar the funds previously paid for the care provided to Mr. Doe.  (AR at 253.)

3   Palomar appealed the RAC's decision to a fiscal intermediary and to a Qualified Independent

4   Contractor ("QIC"), both of which upheld the RAC's denial of coverage.  (AR at 237-51, 265-

5   70.)  The QIC, for the first time, put forth a rationale for the RAC's reopening of this claim.  The

6   QIC asserted that the reopening was proper because it was based on "data analysis."  (AR at 240.)

7       Palomar then appealed to an ALJ.  (AR at 214-222, 224-34.)  At the ALJ hearing, Palomar

8   argued both that the care provided to Mr. Doe was covered by Medicare and that the RAC had no

9   authority to reopen Palomar's Medicare claim for Mr. Doe's care because no "good cause" was

10  shown for reopening the claim more than one year after payment, as required by Medicare regula-

11  tions.  (AR at 60, 67-70, 179-81.)

12      The ALJ held that Mr. Doe's rehabilitation could have been provided at a lower level of

13  care than Palomar's IRF.  (AR at 57-58.)  Thus, the ALJ found that Mr. Doe needed rehabilitation

14  care but that the site of care was too intense.  The ALJ also held that he had jurisdiction to deter-

15  mine whether the reopening was proper and that the RAC had not shown good cause to reopen

16  the claim for Mr. Doe's care.  (AR at 54-57.)  Because the Medicare program had not timely reo-

17  pened this claim, the ALJ ordered that Palomar be paid for the services that it provided to Mr.

18  Doe.  (AR at 58-59.)

19      On February 13, 2009, the MAC modified the ALJ's decision by reversing the ALJ's de-

20  cision that the reopening was improper.  (AR at 1.)  Relying on the regulations at 42 C.F.R. §§

21  405.926(*l*) and 405.980(a)(5), the MAC held that the ALJ lacked jurisdiction to decide whether

22  the RAC reopened Palomar's claim in compliance with Medicare regulations.  (AR at 10-11, 13.)

23  The MAC also held that Mr. Doe could have received his rehabilitation care at a skilled nursing

24  facility, which is a lower level of inpatient care.  (AR at 13.)  Thus, even though Mr. Doe was

25  found to require inpatient rehabilitation services, and Palomar rendered services that rehabilitated

26  Mr. Doe, the Secretary denied all payment to Palomar, four years after having treated Mr. Doe.

27  **IV.   ARGUMENT**

28      The Report errs by accepting the Secretary's interpretation of the regulation.  The Secre-

tary's interpretation of the reopening and appeal regulations is not entitled to deference under Supreme Court precedent because her interpretation is contrary to her stated intent when the regulations were promulgated.  When she issued the current regulations, she stated that she was consolidating and clarifying the existing reopening regulations.  The pre-2005 regulations did not foreclose administrative review.  Her interpretation is also contrary to the plain meaning of the regulations, which shields only purely discretionary reopenings from review.  The Report also fails to analyze whether the Secretary has complied with the statute.  The Secretary has violated  the statutory mandate to reopen claims in compliance with the regulations, and the Secretary's policy frustrates congressional intent.  Foreclosing review of the Secretary's reopening deprives Palomar of due process.  Finally, the Report improperly fails to determine whether good cause was established when the RAC reopened Palomar's claim for the services provided to Mr. Doe.

### A.    The Report and Recommendation Misapplies the *Thomas Jefferson* Standard to the Reopening and Appeal Regulations

#### 1.    *Standard of Review*

Jurisdiction over this action lies under 42 U.S.C. § 1395ff(b) and 42 U.S.C. § 405(g).  Judicial review is pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*. *Maximum Comfort Inc. v. Sec'y of Health and Human Servs.*, 512 F.3d 1081, 1084 (9th Cir. 2007).  The provision of the APA governing the scope of review is 5 U.S.C. § 706, which requires that an administrative decision be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence . . . on the record of an agency hearing . . . ."  5 U.S.C. § 706(2)(A), (E).

With respect to judicial review of regulatory interpretations, a court is required to defer to an agency's interpretation of its own regulation "only when the . . . regulation is ambiguous." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000).  A court shall not defer to an agency's interpretation of its own regulation when an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).  Even if a court accepts the agency's interpretation of

1   its regulation, the court "must then consider whether the regulation so interpreted is consistent

2   with the statute under which it is promulgated." *Cheshire Hosp. v. New Hampshire-Vermont*

3   *Hospitalization Serv., Inc.*, 689 F.2d 1112, 1118 (1st Cir. 1982) (citing *United States v. Larionoff*,

4   431 U.S. 864, 873 (1977)).  Although the Secretary is generally entitled to some deference in in-

5   terpreting her own regulations, when those regulations are ambiguous, her interpretation is sub-

6   ject to the *Skidmore* standard and is accorded weight to the extent it has the "power to persuade, if

7   lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

8       **2.      The Secretary's Decision Is Not Entitled to Deference Because It Is
            Inconsistent With Her Prior Statements That She Was Continuing
9            Existing Policies**

10          The Report errs in concluding that the Secretary's decision is consistent with her state-

11   ments when the regulations were promulgated.  This case concerns Medicare regulations govern-

12   ing the reopening of claims and the regulations defining an "initial determination" that is subject

13   to appeal.  When CMS issued both regulations in 2005, it stated that they were not substantive

14   changes and continued existing policies.  Under the pre-2005 regulations, a party was permitted

15   as part of an administrative appeal to challenge a reopening  that did not comply with regulatory

16   timeframes or the good cause standard.  Thus, her current interpretation of the regulations is in-

17   consistent with her statements at the time of the regulations' promulgation, are not entitled to de-

18   ference, and should be rejected.   *Thomas Jefferson Univ.*, 512 U.S. at 512.

19          The Report ignores the history of the reopening regulations and CMS's statement that it

20   was consolidating and clarifying the reopening regulations, not imposing new requirements.  70

21   Fed. Reg. at 11,450.  The Report instead focuses on CMS's statements in a section of the 2005

22   preamble titled "Enforcement of the Good Cause Standard."  A commenter requested that CMS

23   "create enforcement provisions for the good cause standard."  70 Fed. Reg. at 11,453.  CMS re-

24   sponded as follows:

25          The regulations require that contractors abide by the good cause standard for reo-
            pening actions after one year from the date of the initial or revised determination.
26          CMS assesses a contractor's compliance with Federal laws, regulations and manual
            instructions during audits and evaluations of the contractors' performance.  Thus,
27          the necessary monitoring and enforcement mechanisms are already in place.

28   *Id.*  The Report interprets this passage to say that the agency "would enforce the good cause stan-

1  dard through its own internal procedures, and not through private action via an appeal."  (Report,

2  at 8 (citing 70 Fed. Reg. at 11,453).)  But, CMS never stated that there was no private action via

3  an appeal.  Instead, CMS acknowledged that the necessary enforcement mechanisms are already

4  in place because "[t]he regulations require that contractors abide by the good cause standard."

5  CMS's assessment of contractor performance is one method of monitoring and enforcing the

6  good cause standard, but this statement does not foreclose enforcement in an administrative ap-

7  peal.  This latter mechanism has traditionally been available in the Medicare program, and so

8  there was no need to create it.

9      When CMS revised the reopening and appeal regulations in 2005, CMS stated that the

10  reopening regulations were designed to "address longstanding confusion over the reopening rules

11  for Medicare claim determinations."  70 Fed. Reg. 11,420, 11,450 (Mar. 8, 2005).  CMS ex-

12  plained that the new reopening regulations were designed to "consolidate and clarify the existing

13  reopening provisions."  Likewise, CMS stated that it "generally proposed to maintain the existing

14  policies concerning initial determinations . . . ."  *Id*. at 11,433.

15      The reopening regulations in effect prior to the 2005 revisions referred directly to the SSA

16  regulations governing both the reopening of claims more than one year old and the good cause

17  standard.  42 C.F.R. § 405.750(b)(2) (2004).  As the Secretary points out, SSA has a provision in

18  its Social Security Handbook stating that a reopening decision is not subject to appeal.  (Reply

19  Mem. of Pt.s and Auth. in Supp. of Def.'s Mot. for Summ. J. ("Sec.'s Reply") at n.10.)  This pro-

20  vision first entered the Handbook in 1988.  U.S. Dep't of Health and Human Servs., *Social Secu-*

21  *rity Handbook, 1988*, § 2186.[4]  Section 2186 of the 1988 Social Security Handbook states, in lan-

22  guage virtually identical to the Secretary's 2005 regulations, "The decision to reopen or not to

23  reopen is *not* an initial determination and is *not* subject to appeal."  *Id.* (emphasis in original).

24      This policy did not prohibit claimants from bringing administrative challenges to reopen-

25  ings on the grounds that a claim was not reopened timely or in compliance with the standards for

26  reopening.  In 1994, for example, an ALJ reopened a prior, favorable decision that was more than

27  one year old.  *Cole v. Barnhart*, 288 F.3d 149, 150-51 (5th Cir. 2002).  The ALJ believed that

28  ─────────────
[4] *Available at* http://mirlyn.lib.umich.edu/Record/003924628/Holdings#1.

1   new and material evidence constituted good cause for the reopening. *Id.* As part of her appeal of

2   the resulting revised determination, the claimant was permitted to challenge the reopening before

3   the SSA Appeals Council. *Id.* at 151. The SSA Appeals Council agreed with the claimant that

4   the evidence did not constitute good cause. *Id.* Similarly, in *Heins v. Shalala*, a claimant was

5   permitted to challenge a reopening at a 1991 ALJ hearing, the ALJ determined whether the reo-

6   pening complied with the regulations, and the SSA Appeals Council declined to review the ALJ's

7   decision. 22 F.3d 157, 161 (7th Cir. 1994). Thus, SSA did not interpret the policy of Section

8   2186 to preclude challenges to the lawfulness of a reopening.

9   The policy reflected in section 2186, which was later imported into Medicare regulations,

10   simply reflects Supreme Court precedents holding that the denial of a request to reopen is not ap-

11   pealable. *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449, 451 (1999); *Califano*

12   *v. Sanders*, 430 U.S. 99, 108 (1977). In *Sanders*, a Social Security claimant was denied disability

13   insurance payments by the agency, and this decision was upheld by an ALJ and the SSA Appeals

14   Council. 430 U.S. at 102-03. Several years later, Sanders requested that the ALJ reopen his

15   claim, but the ALJ refused. *Id.* at 103.

16   The Supreme Court held that federal courts do not have jurisdiction to review the denial of

17   a request to reopen. *Id.* at 109. This is because 42 U.S.C. § 405(g), which provides federal court

18   jurisdiction over Social Security (and Medicare) claims, requires a "final decision of the Secretary

19   after a hearing," and when a request to reopen is denied, no hearing is held. *Id.* at 108. The Court

20   also noted that the opportunity to reopen a claim was created by the agency and not by statute. *Id.*

21   Permitting a claimant to appeal the denial of a reopening request would frustrate the statutory 60-

22   day limitation on judicial review and undermine the congressional policy to "forestall repetitive

23   or belated litigation of stale eligibility claims." *Id.* In 1999, the Court extended the principles of

24   *Sanders* to denials of requests to reopen Medicare cost report determinations. *Your Home*, 525

25   U.S. 449, 451 (1999).

26   Consistent with *Sanders* and *Your Home*, it has long been the policy of SSA and the Med-

27   icare program that "[t]he decision to reopen or not to reopen is *not* an initial determination and is

28   *not* subject to appeal." *Social Security Handbook, 1988*, § 2186; *see also* 42 C.F.R. §§

1   405.926(*l*), 405.980(a)(5).  A claimant may not request reopening and then revive a stale claim

2   for which no other appeal rights exist by appealing the denial of the reopening. *Sanders*, 430 U.S.

3   at 109.  Likewise, a claimant may not challenge the decision to reopen a claim by arguing that

4   reopening would be inequitable, and a claimant also may not appeal a reopening that occurs with-

5   in one year of payment when reopening is permitted "for any reason" 42 C.F.R. § 405.980(b).

6         *Sanders* and *Your Home* have never been understood by the courts, however, to shield

7   from administrative review reopenings that are in violation of the regulations.  In *United States v.*

8   *Beck*, the Eleventh Circuit explicitly stated that an administrative hearing is "the proper forum for

9   Beck to challenge the validity of the reopening . . . and the timeliness with which he was notified

10  of the reopening of the initial determinations."  758 F.2d 1553, 1557 (11th Cir. 1985).  The Fifth

11  Circuit agreed, holding that "whether good cause existed is a matter of independent determination

12  by" the administrative hearing officer. *Tex. Med. Ass'n v. Sullivan*, 875 F.2d 1160, 1169-70 (5th

13  Cir. 1989).  Indeed, as noted above, the SSA Appeals Council permitted claimants to seek en-

14  forcement of the good cause standard even after the agency implemented a policy that the deci-

15  sion to reopen or not to reopen is not subject to appeal.  *Cole*, 288 F.3d at 150-51.

16        Moreover, even after *Your Home*, another Medicare administrative tribunal, the Provider

17  Reimbursement Review Board ("PRRB"), has reviewed whether fiscal intermediaries lawfully

18  reopened cost reports.[5]  *See, e.g.*, *Med. Ctr. of N. Hollywood (North Hollywood, Cal.) v. Blue-*

19  *Cross BlueShield Ass'n/ Nat'l Gov't Servs.-CA*, Dec. No. 2008-D31, Medicare & Medicaid Guide

20  (CCH) ¶ 82,103 (Jun. 18, 2008); *Harbor Healthcare & Rehab. Ctr. (Lewes, Del.) v. BlueCross*

21  *BlueShield Ass'n/Empire Medicare Servs. (n/k/a Nat'l Gov't Servs.-NY)*, Dec. No. 2007-D64,

22  Medicare & Medicaid Guide (CCH) ¶ 81,775 (Aug. 24, 2007); *Logos Healthcare Rehab. of*

23  *Tenn., Inc. (Franklin, Tenn.) v. BlueCross BlueShield Ass'n/Palmetto Gov't Benefits Adm'rs*, Dec.

24  No. 2007-D77, Medicare & Medicaid Guide (CCH) ¶ 81,788 (Sep. 27, 2007); *Mark Twain St.*

25  _____

26  [5] Medicare cost reports are subject to an appeals process separate from appeals of individual
    claims for services.  The cost report is used to determine the total amount owed to the hospital by

27  Medicare for the year. 42 U.S.C. §§ 1395x(v)(1)(A), 1395ww(a).  A hospital that is dissatisfied
    with the final determination of total reimbursement may file an administrative appeal with the

28  PRRB.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.

1    *Joseph's Hosp. (San Andreas, Cal.) v. BlueCross BlueShield Ass'n/United Gov't Servs.*, Dec. No.

2    2002-D30, Medicare & Medicaid Guide (CCH) ¶ 80,889 (Aug. 2, 2002).  This includes cases in

3    which the PRRB invalidated reopenings that were untimely.  *See, e.g.*, *Mark Twain St. Joseph's*

4    *Hosp.*, Medicare & Medicaid Guide (CCH) ¶ 80,889; *Med. Ctr. of N. Hollywood*, Medicare &

5    Medicaid Guide (CCH) ¶ 82,103.  The Secretary does not dispute the PRRB's authority to review

6    the legality of reopenings, even though cost report regulations contain language similar to the

7    claim regulations: "A determination or decision to reopen or not to reopen a [cost report] deter-

8    mination or decision is . . . not subject to further administrative review . . . ."  42 C.F.R. §

9    405.1885(a)(6).  ALJ jurisdiction should be interpreted consistently with PRRB jurisdiction on

10   this point.

11          When finalizing the 2005 regulations, CMS specifically invoked *Sanders* and *Your Home*

12   as the basis for the regulations at §§ 405.926(*l*) and 405.980(a)(5).  74 Fed. Reg. at 65,312-13; 70

13   Fed. Reg. at 11453.  CMS explained that it was merely codifying longstanding policy, as affirmed

14   by the Supreme Court, that the denial of a request for reopening is not appealable.  74 Fed. Reg.

15   at 65,312-13; 70 Fed. Reg. at 11,453.  CMS emphasized that the regulations promoted "adminis-

16   trative finality and efficiency," and "a party must have a reasonable expectation as to the adminis-

17   trative finality of a decision."   70 Fed. Reg. at 11,453.  The Secretary's current interpretation that

18   these regulations foreclose administrative review eliminates all administrative finality.  That in-

19   terpretation is inconsistent with her statements when the regulations were promulgated and should

20   be rejected.  *Thomas Jefferson Univ.*, 512 U.S. at 512.

21          ***3.      The Regulations Only Shield the Discretionary Decision to Reopen***

22          The plain language of the Medicare regulations confers jurisdiction on ALJs to review

23   whether a contractor, such as the RAC, reopens a claim in compliance with Medicare require-

24   ments.  The regulations do not limit an ALJ to reviewing only initial determinations.  ALJs may

25   review "all the issues brought out in the initial determination, redetermination, or reconsidera-

26   tion" plus "new issues."  42 C.F.R. § 405.1032.  The only limitations on a new issue are that it

27   "[c]ould have a material impact on the claim" and that it is permissible under the reopening regu-

28   lation at 42 C.F.R. § 405.980.  *Id.* § 405.1032(b).  A contractor reopening has a material impact

1   upon the claim, and the regulation at § 405.980 only shields from review the discretionary deci-

2   sion to reopen.  The Secretary's new interpretation that the regulation divests ALJs of jurisdiction

3   to adjudicate the legality of a contractor reopening is not entitled to deference because it is con-

4   trary to the regulation's plain meaning.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512

5   (1994).

6        The Report's citation to *Anaheim Memorial Hospital v. Shalala* is misplaced.  (Report, at

7   7 (citing 130 F.3d 845, 848 (9th Cir. 1997).)  *Anaheim* did not hold, as the Report contends, that

8   the right of appeal "attaches only to the scope of the revision, and not to the threshold basis for

9   reopening the claim."  (Report, at 7.)  In *Anaheim*, the lawfulness of the reopening was not at is-

10  sue.  The Secretary had reopened and revised a hospital's cost report, and when Anaheim ap-

11  pealed the revision to the PRRB, Anaheim sought to expand the scope of the appeal to reim-

12  bursement matters that were not addressed in the revised determination.  130 F.3d at 848-49.

13  Anaheim was, in effect, attempting to "bootstrap" issues onto its appeal of the revised determina-

14  tion that it had failed to appeal within the statutory deadline for contesting the initial determina-

15  tion.  *Anaheim* stands only for the proposition that a hospital must diligently pursue its appeal

16  rights at the first opportunity and may not use the reopening process to appeal stale issues that are

17  not covered in the revised determination.  *Id.* at 851.  *Anaheim* says nothing about whether a hos-

18  pital may contest a reopening that is untimely.  In fact, as noted above, the PRRB routinely hears

19  appeals challenging the reopening procedures used by Medicare contractors, and the Secretary

20  does not contest its authority to do so.  *See, e.g.*, *Med. Ctr. of N. Hollywood*, Dec. No. 2008-D31,

21  Medicare & Medicaid Guide (CCH) ¶ 82,103.

22       Medicare appeal regulations repeatedly distinguish between "determinations" and "is-

23  sues," and the Report fails to address this distinction.  On redetermination, the fiscal intermediary

24  reviews its initial determination and "may raise and develop new issues that are relevant to the

25  claims in the particular case," indicating that disposition of the appeal may hinge on "issues"

26  beyond the initial determination.  42 C.F.R. § 405.948.  Similarly, the QIC conducts a "review of

27  an initial determination, including the redetermination and all issues related to payment of the

28  claim."  *Id.* § 405.968(a).  An ALJ considers "all the issues brought out in the initial determina-

1    tion, redetermination, or reconsideration," and the ALJ can add new issues.  *Id.* § 405.1032.  At

2    each stage of appeal, "issues" are treated as separate from the "determination."  A determination

3    may be affirmed or reversed by deciding an issue separate from the determination so long as the

4    issue has a material impact on the disposition of the claim.

5         The regulation at 42 C.F.R. § 405.926(*l*) does not apply to the issues that an ALJ may ad-

6    dress.  Section 405.926(*l*)—which states that a contractor's decision to reopen or not to reopen a

7    claim is not an initial determination—solely addresses the definition of an "initial determination"

8    and does not limit the issues that may be considered when adjudicating the appropriateness of an

9    initial determination.  Even if the Secretary is correct that this regulation precludes an initial ap-

10   peal challenging the manner in which a contractor reopens a claim, it does not prevent an ALJ

11   from reviewing that issue. Nowhere do the regulations mention § 405.926(*l*) as a limitation on the

12   addition of a new issue.  Once a claim is validly appealed, as it was here based upon the RAC's

13   determination that the services were not covered by Medicare, the ALJ may consider all issues

14   relevant to the proper disposition of that appeal.  The only limitations on the ALJ's consideration

15   of new issues are that the issues must have a material impact upon the claims subject to the appeal

16   and the issues must be permissible under the reopening regulations of 42 C.F.R. § 405.980(a).  42

17   C.F.R. § 405.1032(b).  Whether the reopening was proper plainly has a material impact upon the

18   claims subject to this appeal, and this may be considered by an ALJ.

19        Nor does the regulation at 42 C.F.R. § 405.980(a) divest an ALJ of jurisdiction to review

20   the legality of a contractor reopening.  The regulation at § 405.980(a)(5) states that the "decision

21   on whether to reopen" is not reviewable.  The regulation does not foreclose "the fact of the reo-

22   pening" as argued by the Report.  (Report, at 8.)  The term "whether" is a conjunction indicating

23   alternate possibilities, i.e., the decision to reopen or the decision not to reopen.  The American

24   Heritage Dictionary of the English Language 1958 (4th ed., Houghton Mifflin Co. 2006).  The

25   foreclosure of review is, therefore, limited to the discretion that Congress granted to the agency to

26   decide whether or not to reopen a claim.  This regulation simply codifies longstanding Medicare

27   and SSA policy implementing the holding of *Sanders* and *Your Home* that the discretionary deci-

28   sion to reopen is shielded from review.

1    An appeal of the procedures used to reopen does not render the regulation meaningless, as

2   the Report contends.  (Report, at 8.)  If, for instance, a contractor declines a request to reopen a

3   claim, an ALJ could not second-guess that discretionary decision.  Or, if a contractor, on its own

4   motion, reopens a claim within one year "for any reason," the ALJ would not have authority to

5   reverse the decision to reopen because the regulation unambiguously accords complete discretion

6   to the contractor to reopen within the first year.

7    Where the regulation defines a standard for reopening, § 405.980(a)(5) does not shield

8   from review the manner in which the contractor accomplishes the reopening.  The regulation does

9   not state that a party is foreclosed from appealing a reopening that fails to comply with the statu-

10   torily mandated "guidelines established by the Secretary in regulations."  42 U.S.C. §

11   1395ff(b)(1)(G); 42 C.F.R. § 405.980(a)(5).  Such a regulatory provision would be contrary to the

12   statute and invalid.  Thus, an ALJ's broad discretion to consider issues that have a material im-

13   pact on the claim is not foreclosed by 42 C.F.R. § 405.980(a)(5).

14    To conclude otherwise would effectively nullify the timeframes for reopening and the

15   good cause standard established in the Secretary's regulations.  If regulated parties cannot chal-

16   lenge a contractor reopening before an ALJ, then the one-year time limit for reopening for "any

17   reason," and the good cause standard would become nullities.  Contractors could flaunt the good

18   cause standard, as was done in this case, and reopen within four years "for any reason."  Indeed,

19   nothing in the Secretary's construction of the regulations would prevent a contractor from reopen-

20   ing claims even twenty or thirty years old.

21    ***4.        The Report Fails to Consider That the Secretary Has Issued Inconsistent
              Decisions, Which Undermines Any Deference That She May Be Owed***

22

23    Any deference that the Secretary might be owed is undermined because she has not been

24   consistent in her interpretation of the reopening regulations, and the Report fails to consider the

25   Secretary's inconsistency.  *Nat'l Res. Def. Council v. E.P.A.*, 526 F.3d 591, 605-06 (9th Cir.

26   2008). Prior to this case, Palomar appealed another claim denied by the RAC, and an ALJ held, as

27   in the case at bar, that because the RAC had failed to establish good cause for the reopenings, the

28   reopenings were contrary to law.  *In the Case of Palomar Medical Center*, (MAC Jan. 11, 2008)

1   ("*Palomar I*") (Mot. S. J., Attach. 2). Accordingly, the ALJ ordered that Medicare pay the claims.

2   (Mot. S. J., Attach. 2 at 5-6.)  The Secretary remanded the cases to the ALJ because the ALJ had

3   not provided notice to the RAC that the legality of the reopening would be considered.  (*Id.* at 7-

4   8.)  The Secretary acknowledged that the legality of a reopening is an "issue" that an ALJ may

5   review.  (*Id.* at 7-8.) The Secretary ordered a new hearing in which all parties would be given no-

6   tice of the issues and an opportunity to present testimony and evidence on those issues.  (*Id.* at 8.)

7        In *Palomar I*, the Secretary did not state, or even imply, that the ALJ was without jurisdic-

8   tion to decide whether the reopenings were proper.  Jurisdiction is a threshold issue, and the Sec-

9   retary's remand order demonstrates that she believed in that case that ALJs indeed have jurisdic-

10  tion to evaluate the legality of a reopening.  *See Steel Company v. Citizens for a Better Environ-*

11  *ment*, 523 U.S. 83, 94-95 (1998).  Thus, *Palomar I* conflicts with the Secretary's decision in this

12  case.  Because she has issued conflicting decisions on this issue, the Secretary's current position

13  is entitled to little deference.  *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *INS v.*

14  *Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987); *Watt v. Alaska*, 451 U.S. 259, 273 (1981).

15      **B.**     **The Report Fails to Analyze the Statute, Which Requires that Reopenings Be**
                  **Subject to Review**

16

17          **1.**    *Standard of Review*

18       The Supreme Court has developed separate standards of review for agency interpretations

19  of statutes and regulations.  Judicial review of an agency's construction of a statute it administers

20  is generally governed either by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

21  467 U.S. 837 (1984), or by *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *See United States v.*

22  *Mead Corp.*, 533 U.S. 218 (2001).  The Report misapplies the *Chevron* standard of review by ac-

23  cording complete deference to the agency without analyzing the statute and applying a well-

24  established two-step analysis.  (Report, at 5-7, 9.)  The Report further errs by asserting that the

25  *Chevron* standard of review is applicable only when a regulation is ambiguous.[6]  (Report at 6.)

26    [6] Palomar contends that the Secretary's interpretation is not entitled to heightened deference un-
    der *Chevron* because the issue involved here is a quasi-judicial procedural matter, and "[t]he

27  questions presented . . . are not demanding of medical or Medicare program expertise."  *Mem'l*
    *Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir. 1980).  Even under the *Chevron* standard, however, the

28  Secretary's interpretation fails.  Palomar refers the Court to its Motion for Summary Judgment at

1    Under *Chevron*, there are two steps to a court's review.  First, the court must determine

2  whether Congress "has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at

3  842-43; *CHW West Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001).  If Congress's intent

4  is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to

5  the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43; *CHW West Bay*,

6  246 F.3d at 1223.

7    Only if the statute is ambiguous does a court reach the second step of *Chevron* review,

8  which involves determining whether the agency's interpretation is "based on a permissible con-

9  struction of the statute."  *Chevron*, 467 U.S. at 842-43; *CHW West Bay*, 246 F.3d at 1223.  Under

10  the second step, "deference is not owed to an agency decision if it construes a statute in a way

11  that is contrary to congressional intent or frustrates congressional policy."  *CHW West Bay*, 246

12  F.3d at 1223.

13    Therefore, it is not sufficient merely to agree with an agency's interpretation of a regula-

14  tion.  *Chevron* demands that the regulation, so interpreted, be set against the enabling statute to

15  determine whether it both complies with the plain language of the statute and congressional in-

16  tent.  The Report fails to undertake this analysis.  As shown below, the Secretary's interpretation

17  of the reopening regulations, as adopted by the Report, renders those regulations contrary to the

18  statute and invalid.

19         **2.    *The Medicare Statute Requires That ALJs Have Jurisdiction to***
                ***Review the Legality of Contractor Reopenings***
20

21              **a.    Chevron Step 1: The Plain Language of the Statute Requires**
                      **the Secretary to Reopen Only in Compliance With the**
22                     **Regulations**

23    The year after the *Your Home* decision, Congress amended the statutory provisions go-

24  verning Medicare appeals by adding the reopening provision at 42 U.S.C. § 1395ff(b)(1)(G),

25  which is consistent with the principles set forth in that decision.  Congress specified that the Sec-

26  retary "may reopen and revise any initial determination," but only "under guidelines established

27  by the Secretary in regulations."  42 U.S.C. § 1395ff(b)(1)(G).  Congress confirmed, by using the

28  7-9 and its Opposition at 8-9 for a full discussion of the standard of review.

permissive term "may," that the *decision* whether or not to reopen is discretionary.  Under the reasoning of *Your Home* and *Sanders*, the decision of whether or not to reopen is not reviewable.

The plain language of this provision requires the Secretary to comply with whatever regulations she promulgates to govern the reopening of claims.  Once the Secretary (or one of her agents) exercises that discretion, Congress also imposed a non-discretionary duty to obey the reopening regulations: reopenings must occur "under guidelines established by the Secretary in regulations." 42 U.S.C. § 1395ff(b)(1)(G).  An unlawful reopening must be subject to review because the agency does not have discretion to violate its own regulations.  *See Service v. Dulles*, 354 U.S. 363, 388 (1957).  Thus, although the statute grants the Secretary discretion as to the form of the reopening regulations, it does not permit the Secretary to reopen claims in violation of those regulations.

Here, the Secretary has established strict deadlines and standards for reopening claims and then interprets the regulations in a way that renders those deadlines and standards meaningless.  The regulation sets a one-year deadline for reopening claims "for any reason." 42 C.F.R. § 405.980(b).  Between one and four years, "good cause" is required for the reopening.  *Id.*  Good cause is a defined standard requiring "new and material evidence" that was either not known or available at the time of payment.  *Id.* § 405.986(a).  To interpret the appeal regulations as shielding these deadlines and standards from review nullifies them.

That is exactly what happened here.  The RAC reopened Palomar's claim for payment more than one year after payment without even asserting good cause, much less demonstrating it.  The Secretary, through the RAC, did not reopen the claim "under guidelines established by the Secretary in regulations" as required by the statute. 42 U.S.C. § 1395ff(b)(1)(G).  The Secretary has argued before this Court that good cause is not "privately enforceable" and that only the Secretary may enforce the good cause standard.  The record is devoid of any indication that the Secretary actually enforces the good cause standard or that she stepped in to rectify the RAC's procedural violations here.  To the contrary, both through the MAC and in this litigation, the Secretary has sought to shield the RAC's actions from review, ensuring that the good cause standard is not enforced.

1        Furthermore, Congress conferred authority upon the Secretary to reopen claims in a statu-

2    tory section titled, "Appeal rights."  42 U.S.C. § 1395ff(b), (b)(1)(G).  Congress's placement of

3    the reopening authority within the subheading of "appeal rights" demonstrates that Congress in-

4    tended to confer a right to appeal the manner in which a claim is reopened.  *See Fla. Dept. of*

5    *Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326, 2336 (2008) ("[S]tatutory titles and sec-

6    tion headings 'are tools available for the resolution of a doubt about the meaning of a statute.'"

7    (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002))).  A request to reopen a claim is not an ap-

8    peal.  70 Fed. Reg. 11,420, 11,451 (Mar. 8, 2005).  Thus, the "appeal right" that is conferred by §

9    1395ff(b)(1)(G) must be the right to challenge whether the claim has been reopened "under

10    guidelines established by the Secretary in regulations."

11        The Supreme Court instructs, "In making the threshold determination under *Chevron*, 'a

12    reviewing court should not confine itself to examining a particular statutory provision in isola-

13    tion.'  Rather, '[t]he meaning—or ambiguity—of certain words or phrases may only become evi-

14    dent when placed in context . . . ."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551

15    U.S. 644, 666 (2007) (citations omitted).  In the same section of the statute that contains the reo-

16    pening provision, Congress twice expressly limited administrative review of particular determina-

17    tions, but did not do so for claim reopenings.  Congress specified that review of national coverage

18    determinations under 42 U.S.C. § 1395ff(f) shall not be "construed as permitting administrative

19    or judicial review pursuant to this section insofar as such review is explicitly prohibited or re-

20    stricted under another provision of law."  42 U.S.C. § 1395ff(f)(8).  Congress also prohibited ad-

21    ministrative appeals of certain contractor pre-service determinations of whether physicians' ser-

22    vices are covered by Medicare.  *Id.* § 1395ff(h)(6).

23        The exclusion of administrative review in these very specific instances in the same statu-

24    tory section as the reopening provision demonstrates that administrative review is not excluded

25    for reopenings: "[I]t is a general principle of statutory construction that when Congress includes

26    particular language in one section of a statute but omits it in another section of the same Act, it is

27    generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

28    exclusion."  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (internal quotations and cita-

1    tions omitted).  This follows from a canon of interpretation—*expressio unius est exclusio alte-*

2    *rius*—holding that to express or include one thing implies the exclusion of the other, or of the al-

3    ternative.  *TRW Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001); *Nat'l R. R. Passenger Corp. v. Nat'*

4    *Ass'n of R. R. Passengers*, 414 U.S. 453, 458 (1974).

5          It is not merely the section heading, "Appeal Rights," that confers jurisdiction on ALJs to

6    evaluate whether contractors lawfully reopen claims. 42 U.S.C. § 1395ff(b).  Section 1395ff(b)

7    specifically requires that parties be given appeal rights "to the same extent as is provided in sec-

8    tion 405(b)."   Section 405(b) is the provision governing administrative appeals of Social Security

9    determinations.  42 U.S.C. § 405(b).  Social Security claimants may challenge the legality of reo-

10   penings in administrative proceedings.  *See Wyatt v. Barnhart*, 349 F.3d 983, 984 (7th  Cir.

11   2003); *Cole v. Barnhart*, 288 F.3d 149, 150 (5th Cir. 2002); *Barone v. Bowen*, 869 F.2d 49, 50

12   (2d Cir. 1989); *Dugan v. Sullivan*, 957 F.2d 1384, 1387 (7th Cir. 1992).  This appeal right exists

13   for Social Security claimants despite a policy that is almost identical to the Secretary's: "The de-

14   cision to reopen or not to reopen is not an initial determination and is not subject to appeal."  So-

15   cial Security Handbook, § 2197.[7]  This is because this language merely codifies a longstanding

16   legal principle that "the Secretary's decision to reopen or not to reopen a claim is discretionary."

17   *Nieland v. Shalala*, 1994 WL 163255 (D.Or. 1994) (citing *Taylor v. Heckler*, 765 F.2d 872 (9th

18   Cir. 1985)).

19         Likewise, Medicare hearings under § 405(b) have historically included the right to chal-

20   lenge the procedures used for reopening.  The First Circuit has held that challenges to the *proce-*

21   *dures* employed for reopening a claim were proper.  *McCuin v. Sec'y of Health and Human*

22   *Servs.*, 817 F.2d 161, 166 (1st Cir. 1987).  The Eleventh Circuit explicitly stated that an adminis-

23   trative hearing is "the proper forum for Beck to challenge the validity of the reopening . . . and the

24   timeliness with which he was notified of the reopening of the initial determinations."  *United*

25   *States v. Beck*, 758 F.2d 1553, 1557 (11th Cir. 1985).  The Fifth Circuit agreed, holding that

26

27

28   ───────────────
     [7] *Available at* http://www.socialsecurity.gov/OP_Home/handbook/handbook.21/handbook-2197.html (last accessed May 20, 2010).

1  "whether good cause existed is a matter of independent determination by" the hearing officer.[8]

2  *Tex. Med. Ass'n v. Sullivan*, 875 F.2d 1160, 1169-70 (5th Cir. 1989).

3  **b.  Chevron Step 2: The Secretary's Interpretation Frustrates**
   **Congressional Policy**

4

5  The Secretary's interpretation of the regulation also frustrates congressional policy.  The

6  Medicare statute broadly presumes that administrative review will be available because when

7  Congress intends to foreclose review, it does so explicitly.  For example, Congress forbade ad-

8  ministrative review of the payment methodology for certain drugs.  42 U.S.C. §§ 1395w-3a(g),

9  1395u(o)(7).  Congress foreclosed administrative review of the payment system for certain outpa-

10  tient surgical services and procedures.  *Id.* §§ 1395*l*(i)(2)(D)(v), 1395u(b)(10)(D).  Congress

11  shielded from administrative review the payment amounts for ambulance services.  *Id.* §

12  1395m(*l*)(5).  Quality reporting measures are explicitly closed to review.  *Id.* § 1395w-4(k)(7).

13  When contractors extrapolate overpayments, their determination of the provider's error rate is not

14  subject to review.  *Id.* § 1395ddd(f)(3).  Congress has, in fact, forbidden administrative review

15  dozens of times, and when it has done so, it has been crystal clear.[9]

16  [8] In *Texas Medical Association*, the court held that it did not have jurisdiction to decide the good
cause issue because the plaintiffs had not exhausted their administrative remedies. 875 F.2d at

17  1167-70.  The court, therefore, remanded for a hearing on the good cause determination.  *Id.* at
1170-71.  *Texas Medical Association* is distinct from Palomar's case in this respect because Pa-

18  lomar has exhausted administrative remedies, and an ALJ has decided the good cause issue.
[9] *See, e.g.*, 42 U.S.C. § 1395i-5(c)(2)(D) (no administrative review of payments for religious non-

19  medical health care institutional services); *id.* § 1395*l*(m)(4) (no administrative review of infor-
mation used for calculating certain incentive payments); *id.* § 1395*l*(t)(12) (no administrative re-

20  view of certain factors used for calculating prospective payments for outpatient services); *id.* §
1395m(*l*)(12)(B)(v) (no administrative review of identification of an area as rural for purposes of

21  enhanced payments for ambulance services); *id.* § 1395w-3(a)(1)(D)(i)(IV) (no administrative
review of termination of certain contracts); *id.* § 1395w-3(b)(11) (no administrative review of

22  awarding of certain contracts); *id.*§ 1395w-3b(g) (no administrative review of competitive acqui-
sition of outpatient drugs); *id.* § 1395w-4(i)(1) (no administrative review of certain factors used to

23  calculate payment for physician services); *id.* § 1395w-4(m)(5)(E) (no administrative review of
certain factors used in calculating incentive payments for quality reporting measures); *id.* §

24  1395w-4(o)(3)(C) (no administrative review of methodology and standards for incentive pay-
ments for use of electronic health records); *id.* § 1395w-23(*l*)(8) (no administrative review of me-

25  thodology and standards for certain incentive payments); *id.* § 1395w-23(m)(6) (same); *id.* §
1395oo(g) (no administrative review by Provider Reimbursement Review Board of medical ne-

26  cessity determinations); *id.* § 1395rr(b)(12)(H) (no administrative review of certain factors used
to determine payments for end-stage renal disease); *id.* § 1395rr(b)(14)(G) (same); *id.* §

27  1395rr(h)(5) (no administrative review of certain factors used to determine incentive payments
for certain dialysis services); *id.* § 1395ww(d)(7) (no administrative review of certain factors used

28  to determine prospective payments for inpatient hospital services); *id.* § 1395ww(h)(7)(E) (no

1   This trend is no less pronounced in the new health reform law that Congress recently

2   enacted.  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010)

3   ("PPACA").  For example, Congress created a "value based purchasing program" in which hos-

4   pitals will receive incentive payments for meeting certain performance standards.  PPACA, §

5   3001.  Congress directed the Secretary to establish an appeals process for challenging a hospital's

6   performance score but expressly removed from administrative review the methodologies used to

7   calculate the score.  *Id.*  PPACA also reduces payments to hospitals whose patients acquire cer-

8   tain medical conditions while admitted.  *Id.* § 3008.  The Secretary is empowered to choose the

9   conditions, and her choices are not subject to appeal.  *Id.*  Congress explicitly restricted adminis-

10  trative review nine more times in PPACA.  *Id.* §§ 3003, 3007, 3021, 3022, 3025, 3133, 3403,

11  5501, 6001.  It is unreasonable to conclude that Congress would, in the current case, silently grant

12  the Secretary, in a statutory provision called "appeal rights," the authority to shield the Secre-

13  tary's contractors from administrative review of thousands of claim reopenings.

14  **C.   The Secretary Deprived Palomar of Due Process of Law**

15  Palomar also objects to the Report's finding that the Secretary's interpretation of the regu-

16  lations comports with due process.  Palomar refers the Court to its Memorandum in support of its

17  Motion for Summary Judgment at 18-20 and its Opposition at 16-17 for its position on this issue.

18  **D.   The Report Fails to Determine Whether the RAC Complied With the
        Reopening Regulations**
19

        ***1.   This Court Has Jurisdiction to Determine Whether the RAC Complied
               With the Law, Even if Administrative Review Is Foreclosed***
20

21  The Report errs by not addressing whether the RAC established good cause to reopen Mr.

22  Doe's claim.  The Report simply states, without analysis, that "this Court will not evaluate

23  whether there was actual good cause to reopen the claim because that issue is not appealable."

24  _____

25  administrative review of redistribution of resident slots used for calculating graduate medical
    education payments); *id.* § 1395ww(j)(7) (no administrative review of certain factors used for
    calculating prospective payments to rehabilitation hospitals); *id.* § 1395ww(n)(4)(A) (no adminis-
26  trative review of certain factors used to determine certain incentive payments to hospitals); *id.* §
    1395yy(e)(8) (no administrative review of certain payment rates for skilled nursing facilities); *id.*
27  § 1395fff(d) (no administrative review of certain factors used to determine payment rates for
    home health services); *id.* § 1395hhh(i) (no administrative review of loan program for hospital
28  capital costs).

1   (Report, at 9.)  The Report conflates the issue of whether good cause is appealable at the adminis-

2   trative level with the issue of whether it is appealable in federal court.  The standards are differ-

3   ent.  Even if the Report is correct that the Secretary may foreclose administrative review of the

4   reopening regulations, the Secretary may not divest this Court of jurisdiction to determine wheth-

5   er the Secretary has complied with her own regulations.

6          The U.S. Constitution vests Congress with exclusive authority to limit federal court juris-

7   diction.  U.S. Const. art. III, § 2.  Courts have found that "it is axiomatic that Congress . . . could

8   not delegate, the power to any agency to oust . . . federal district courts of subject matter jurisdic-

9   tion." *Miller v. FCC,* 66 F.3d 1140, 1144 (11th Cir. 1995); *see also EEOC v. Lutheran Soc.*

10  *Servs.*, 186 F.3d 959, 962 (D.C. Cir. 1999); *United States v. Mitchell,* 18 F.3d 1355, 1360 n.7 (7th

11  Cir.1994).  Even if this power could be delegated to an agency, Congress would have to do so ex-

12  plicitly.  *See Warren v. U.S. Dep't of the Interior Bureau of Land Mgmt.*, 724 F.2d 776, 778 (9th

13  Cir. 1984); *Mitchell,* 18 F.3d at 1360 n.7.  Congress has not done so here, and the Secretary's

14  regulations do not deprive this Court of jurisdiction to decide whether the RAC complied with the

15  good cause standard.

16         It is well established that federal courts have authority to review whether claims have been

17  lawfully reopened.[10]  *See, e.g.*, *Overend v. Sullivan*, 879 F.2d 673 (9th Cir. 1989); *Wyatt v. Barn-*

18  *hart*, 349 F.3d 983 (7th Cir. 2003); *Cole v. Barnhart*, 288 F.3d 149 (5th Cir. 2002); *Fox v. Bowen*,

19  835 F.2d 1159 (6th Cir. 1987); *Butterworth v. Bowen*, 796 F.2d 1379 (11th Cir. 1986); *Zimmer-*

20  *mann v. Heckler*, 774 F.2d 615 (4th Cir. 1985); *Higginbotham v. Heckler*, 767 F.2d 408 (8th Cir.

21  1985); *Munsinger v. Schweiker*, 709 F.2d 1212 (8th Cir. 1983); *Marsh v. Heckler*, CIV No. S-82-

22  1122 LKK, 1984 WL 34769 (E.D. Cal. Feb. 14, 1984).  The concerns that underlie *Sanders* and

23  *Your Home* are not applicable when a claimant is seeking to enforce the reopening regulations,

24  rather than seeking review of the Secretary's refusal to reopen a claim.  There has been a final

25  decision after a hearing.  *Sanders*, 430 U.S. at 108.  No statutory deadline has been frustrated.  *Id.*

26  _____

[10] The Report places too much emphasis on Palomar's citation to *Wyatt v. Barnhart*, 349 F.3d 983
27  (7th Cir. 2003).  (Report, at n.4.)  Palomar never claimed that this case is binding here.  Rather,
Palomar cited it as one among many cases in which courts have reviewed whether claims were
28  reopened in compliance with the regulations.  Indeed, the Ninth Circuit has also done so.  *Over-*
*end v. Sullivan*, 879 F.2d 673 (9th Cir. 1989).

1    Furthermore, unlike in *Sanders* and *Your Home*, reopening is not solely a creature of the Secre-

2    tary's regulations because, in 2000, Congress provided a legislative basis for reopening and re-

3    quired that reopening occur in compliance with regulations.  BIPA, § 521, 114 Stat. at 2763A-

4    537; 42 U.S.C. § 1395ff(b)(1)(G).  Judicial review is necessary to ensure that the Secretary com-

5    plies with those regulations.  *See Service v. Dulles*, 354 U.S. 363, 388 (1957).

6                    **2.      *The RAC Unlawfully Reopened Palomar's Claim for Mr. Doe's Care***

7            Palomar contends that the RAC lacked good cause to reopen Mr. Doe's claim, and the

8    denial of payment must be reversed.  Palomar refers the Court to its Memorandum in support of

9    its Motion for Summary Judgment at pages 20 to 24 for its position on this issue.

10   **V.      CONCLUSION**

11           For the foregoing reasons, Palomar objects to the Magistrate's Report and Recommenda-

12   tion.  Palomar respectfully contends that this Court should grant Palomar's motion for summary

13   judgment and deny the Secretary's cross motion for summary judgment.

14

15                                               Respectfully submitted,

16                                               Palomar Medical Center
                                                 By its counsel,
17

18                                               /s/Ronald S. Connelly
     Dick A. Semerdjian                          Ronald S. Connelly
19   California Bar No. 123630                    Admitted pro hac vice
     SCHWARTZ SEMERDJIAN HAILE                    D.C. Bar No. 488298
20   BALLARD & CAULEY LLP                         POWERS PYLES SUTTER & VERVILLE, PC
     101 West Broadway, Suite 810                 1501 M Street, NW, 7th Floor
21   San Diego, CA 92101-8229                     Washington, DC 20005
     tel. (619) 699-8326                          tel. (202) 466-6550
22   fax (619) 236-8827                           fax (202) 785-1756
     das@sshbclaw.com                             ron.connelly@ppsv.com
23

24   Attorneys for Plaintiff, Palomar Medical Center

25   Dated: May 26, 2010.

26

27

28

1

## **CERTIFICATE OF SERVICE**

2    I, Ronald S. Connelly, hereby certify that a copy of the foregoing Objections to Report

3  and Recommendation was this date served upon all counsel of record by electronically filing the

4  foregoing with the Clerk of the District Court for the Southern District of California, using its

5  ECF system, which automatically provides electronic notification to the following:

6  Karen P. Hewitt
   United States Attorney
7  Thomas B. Reeve, Jr.
   Assistant U. S. Attorney
8  California State Bar No. 069310
   Room 6293 at 880 Front Street
9  San Diego, California 92101-8893
   Tom.Reeve@usdoj.gov (email)

10

11  Joshua I. Wilkenfeld
    Trial Attorney
12  United States Department of Justice, Civil Division
    Federal Programs Branch
13  20 Massachusetts Avenue NW
    Washington, DC 20530
14  (202) 305-7920
    (202) 616-8470 (fax)
15  Joshua.I.Wilkenfeld@usdoj.gov

16  Attorneys for Defendant

17                                      /s/  Ronald S. Connelly
                                       Ronald S. Connelly
18                                     Attorney for Plaintiff
                                       Palomar Medical Center
19

20  Dated: May 26, 2010.

21

22

23

24

25

26

27

28